# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-1576V

Filed: February 17, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| JOSEPH SPATARO, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | |
| v. | * | Dismissal; Ruling on the Record; Influenza |
| | * | ("Flu") Vaccine; Shoulder Injury Related |
| SECRETARY OF HEALTH | * | to Vaccine Administration ("SIRVA"); |
| AND HUMAN SERVICES, | * | Six-Month Requirement |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

*Paul Brazil, Esq.*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Kyle Pozza, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

**Roth**, Special Master:

On October 20, 2017, Joseph Spataro ("Mr. Spataro" or "petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that he received an influenza ("flu") vaccine on October 12, 2015, and "immediately following vaccination," felt "pain in his left shoulder, with radiating numbness down his arm." *See* Petition ("Pet.") at ¶¶2, 4. Petitioner alleges his left shoulder injury was caused by the flu vaccination and lasted more than six months. *Id.* at ¶¶11.

Petitioner has failed to satisfy the on-Table Criteria and the three prongs set forth in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005) necessary for an off-table

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

claim. Accordingly, I find that petitioner is not entitled to compensation for the reasons set forth below.

## I. Background

**A.     Petitioner's Medical History**

Petitioner had no contributory medical history prior to his flu vaccination.  *See* Pet. Ex. 5.

On October 12, 2015, petitioner, then 38-years old, received an intramuscular flu vaccination in his left deltoid at CVS Pharmacy. Pet. Ex. 1 at 1-2. Ten days later, on October 22, 2015, petitioner presented to OrthoFast, an urgent care clinic complaining of "severe" pain in his left shoulder with radiating numbness down his left arm and difficulty lifting his shoulder. Pet. Ex. 2 at 1. Petitioner reported experiencing left shoulder pain since his flu vaccination. *See id*. Upon examination, Dr. Jean-Paul Lucke noted "tenderness to palpation over lateral deltoid, active range of motion ("ROM") to 90°, [but] passive ROM full." *Id.*  Dr. Lucke diagnosed petitioner with left deltoid pain and noted that petitioner's major complaint was numbness and tingling. Dr. Lucke prescribed a steroid and instructed petitioner to follow-up if his pain persisted. *Id.*

Two months later, on December 21, 2015, petitioner presented to his primary care physician ("PCP"), Dr. Anthony Ciccaglione with complaints of sinus pain, a sharp and painful cough persisting for several days, shortness of breath, a low-grade fever, and green/yellow sinus sputum. Pet. Ex. 5 at 5. Petitioner did not report any left shoulder pain and the record reflected that he had no joint pain and normal extremities. *Id.* at 6-7.

Petitioner's next medical visit was to Dr. David Kovacevic, an orthopedic surgeon on September 30, 2016, for "insidious onset [of] shoulder pain about 18 months ago (February 2015)."[3] Pet. Ex. 3 at 1. Petitioner described the pain as "sharp/stabbing." *Id.* An x-ray of petitioner's left shoulder revealed a superior glenoid traction spur. *Id.* at 3. Dr. Kovacevic diagnosed petitioner with "left shoulder impingement, biceps tendonitis, and a superior labral tear from anterior to posterior ("SLAP") sprain." *Id.* Petitioner was prescribed Mobic and physical therapy ("PT") to address ROM, pain, and functional limitations. *Id.*

Petitioner presented for an initial PT evaluation on October 11, 2016. He reported "bilateral shoulder pain intermittently yet progressing towards constant pain, especially over the last 2 months (L>R)." Pet. Ex. 3 at 4-5. Petitioner "assumed symptoms would self-resolve on their own. When they did not, petitioner sought MD consult for symptoms 2 weeks ago." *Id.* at 5. The PT record documents, "Onset of Illness / Injury Date: 8/12/2016." *Id.* at 4. From October 11, 2016 through March 28, 2017, petitioner attended approximately twenty PT visits. *Id.* at 4-55.

By November 11, 2016, petitioner's left shoulder symptoms persisted, but his right shoulder was improving. Pet. Ex. 3 at 9-10. During a PT session on December 13, 2016, petitioner

---

[3] As previously stated, petitioner's reported history during this visit places the onset of petitioner's shoulder pain prior to his flu vaccination. Petitioner asserts his history is inaccurate because he either reported it incorrectly or the physician documented it incorrectly. *See* Pet. Ex. 7 at ¶3.

2

complained of persistent sharp pain in his left shoulder while completing daily activities. *Id.* at 14. In January of 2017, even though petitioner still complained of left shoulder pain, he reported being "ready to take a break from PT" since he knew "how to do those exercises and stretches." *Id.* at 18. Petitioner was discharged from PT to continue with a home exercise program on January 17, 2017. *Id.* at 18-19.

Three days after his discharge from PT, on January 20, 2017, petitioner returned to Dr. Kovacevic for a follow-up examination due to ongoing shoulder discomfort. Pet. Ex. 3 at 21-22. Dr. Kovacevic was concerned about a possible labral tear and referred petitioner for an MRI. *Id.* at 19-22; Pet. Ex. 6 at 1. An MRI performed on January 31, 2017 revealed findings consistent with adhesive capsulitis. Pet. Ex. 3 at 21-22; Pet. Ex. 6 at 1.

On February 1, 2017, petitioner returned to Dr. Kovacevic to review the results of the MRI. Pet. Ex. 3 at 23-24. Dr. Kovacevic advised petitioner that the MRI of his left shoulder "demonstrate[d] inflammation, capsular thickening, and edema involving axillary pouch. No labral tear and no rotator cuff tear." *Id.* at 24. Dr. Kovacevic administered a cortisone injection in petitioner's left shoulder, prescribed a four-week dose of Mobic, and recommended that petitioner continue physical therapy to address his adhesive capsulitis. *Id.*

Petitioner returned to PT from February 22, 2017 through March 28, 2017, attending eight additional PT sessions to address adhesive capsulitis of his left shoulder. Pet. Ex. 3 at 25-30. On April 19, 2017, petitioner followed-up with Dr. Kovacevic and reported that his left "shoulder motion [was] much improved compared to last visit." *Id.* at 33. Petitioner was discharged and instructed to return to the office "when he gets a flare-up so [sic] can reassess for need for 2nd and final cortisone injection." *Id.* at 34.

There are no further medical records filed.

**B.    Procedural History**

On October 20, 2017, petitioner filed his petition along with his affidavit and medical records. *See* Pet., Petitioner's Exhibits ("Pet. Ex.") 1-6, ECF No. 1. Petitioner also filed proof of vaccination. Pet. Ex. 1 at 2, ECF No. 1. On October 23, 2017, this matter was assigned to the Special Processing Unit ("SPU"). ECF Nos. 5-6.

Petitioner filed additional medical records on December 14, 2017. Pet. Ex. 5, ECF No. 9.

Following the initial status conference held on January 10, 2018, petitioner was ordered to file a supplemental affidavit "describing the onset of his injury after vaccination" and addressing the gap in his treatment between October 22, 2015 and September 30, 2016. Petitioner was also ordered to file the medical records from his January 31, 2017 MRI. Scheduling Order at 1, ECF No. 11.

Petitioner filed the ordered medical records on February 12, 2018 and a supplemental affidavit on February 13, 2018. Pet. Ex. 6, ECF No. 12; Pet. Ex. 7, ECF No. 15.

3

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on October 18, 2018 recommending against compensation. Resp. Rpt. at 1, ECF No. 23. It was respondent's position that petitioner's alleged injury did not meet the criteria for an on-Table SIRVA claim. *Id.* at 4. Specifically, respondent submitted that petitioner did not have an onset of shoulder pain within 48 hours of vaccination but rather his medical history documented onset in February of 2015, prior to vaccination. *Id.* at 4-5. Respondent further submitted that petitioner had not shown that his alleged injury persisted in excess of six months post-vaccination. *Id.* at 5.

This matter was reassigned to me on October 26, 2018. Order, ECF No. 24; Notice of Reassignment, ECF No. 25.

A status conference was held on February 22, 2019. The contents of petitioner's medical records, the 11-month gap in medical treatment, and the six-month issue created by the medical treatment gap were thoroughly discussed. Scheduling Order at 2, ECF No. 26. The discussion highlighted petitioner's presentation for medical treatment for left shoulder pain ten days after vaccination, the following absence of medical treatment for left shoulder pain until September 30, 2016, at which time he reported an insidious onset of left shoulder symptoms 18 months prior (February 2015) with no mention of his flu vaccine, and his presentation for PT in October 2016 where he reported bilateral shoulder pain that started August 12, 2016. *Id.* at 1. The need for additional evidence to corroborate petitioner's claim that his alleged shoulder injury from the October 12, 2015 vaccine persisted in excess of six months was discussed. *Id.* at 2. Petitioner was ordered to file an affidavit and all records relating to his employment—including his employment file, gym attendance and workout routine, hobbies or sports he participated in, household responsibilities, any Christmas celebration during December 2015, and how his alleged injury impacted any of these activities. Additionally, he was ordered to file copies of all social media accounts. *Id.* 2-3.

On April 23, 2019, petitioner filed social media data from his Facebook account via CD. Pet. Ex. 8, ECF No. 27. On May 14, 2019, petitioner filed a supplemental affidavit and two witness affidavits in support of his claim. Pet. Ex. 8-10, ECF No. 30. On May 22, 2019, petitioner filed an additional witness affidavit and an invoice for landscaping to his property to demonstrate outside assistance with household responsibilities. Pet. Ex. 11-12, ECF No. 32.

Respondent filed a status report on July 3, 2019, advising that petitioner's recent filings failed to address any of the issues related to the six-month requirement. Resp. S.R. at 1-2, ECF No. 34. Respondent noted that, among other things, petitioner was ordered to file his employment file, including records documenting any time lost from work or other accommodations that were made due to his injury. *See* Scheduling Order at 2, ECF No. 26. Instead, petitioner filed an affidavit from his HR Manager, Cheryl Schiavone, stating petitioner did not "have an employment file because he did not suffer a workplace injury and did not have disciplinary issues." Resp. S.R. at 1; *see also* Pet. Ex. 10 at ¶2. Respondent also submitted that petitioner was ordered to provide records to address his workout routine including gym attendance, but petitioner instead provided that he did not belong to a gym and rather "performed some exercises at home, including riding an exercise bike and lifting weights that are five pounds or less." *Id.*; *see also* Pet. Ex. 8 at ¶9. Respondent further submitted that petitioner's supplemental affidavit was wholly non-responsive and the witness affidavits from petitioner's two work colleagues, Ms. Schiavone and Mr. Barth,

4

were vague as to the onset of petitioner's shoulder pain. *Id.* at 1-2. Ms. Schiavone affirmed petitioner had shoulder pain for "a long period of time beginning in the fall of 2015-2016…for many months." *Id.*; *see also* Pet. Ex. 10 at ¶4. Mr. Barth affirmed petitioner's complaints of shoulder pain "starting in the fall of 2015." *Id.*; *see also* Pet. Ex. 9 at ¶3. In conclusion, respondent postured "the supporting affidavits are vague as to onset, and none of the affidavits address the large gap in treatment as documented in petitioner's medical records…[therefore] petitioner has not provided sufficient evidence to demonstrate entitlement to compensation." Resp. S.R. at 2-3. Respondent recommended that the parties proceed with a ruling on the record. *Id.* at 3.

Petitioner was ordered to file a status report addressing the still-unexplained 11-month gap in his medical records, the lack of supporting documentation, and respondent's concerns, or he was to file a motion for a ruling on the record by September 3, 2019. Scheduling Order at 2, ECF No. 35.

Petitioner then filed an employment personnel file and an Amended Statement of Completion on September 3, 2019. *See* Pet. Ex. 13, ECF Nos. 36-37. The same day, petitioner filed a Motion for Ruling on the Record, arguing he "has provided evidence that satisfied his burden of proof, establishing that he suffered left shoulder injuries as a result of receiving the influenza vaccine on October 12, 2015." Motion, ECF No. 38.

Respondent filed his response to petitioner's Motion on September 17, 2019 stating the issues in this case remain largely unaddressed and "petitioner has not submitted preponderant evidence of entitlement…as such, the case should be dismissed on the record." Response at 1-4, ECF No. 39.

Petitioner did not file a reply. This matter is now ripe for decision.

**C.     Witness Affidavits**

**1. Petitioner's First Affidavit**

In his first affidavit, dated October 16, 2017, petitioner affirmed that he received the influenza vaccination on October 12, 2015 at CVS Pharmacy. Pet. Ex. 4 at ¶2. He further affirmed he "sustained adhesive capsulitis, shoulder impingement, and biceps tendonitis" as a result of receiving the flu vaccine, *Id.* at ¶3, and suffered the residual effects of his alleged injuries for more than six months. *Id.* at ¶4. This affidavit did not address the onset of petitioner's left shoulder pain, any details related to the vaccine administration, or any particulars associated with the sequelae of his alleged injury.

**2. Petitioner's Second Affidavit**

In a second affidavit, dated February 13, 2018, petitioner affirmed he "began feeling shoulder pain immediately after the vaccination." Pet. Ex. 7 at 1 ¶1. His shoulder hurt as soon as the needle was pulled out, and "[i]t did not feel like normal soreness." *Id.* According to petitioner he either misreported the timeframe of the onset of his shoulder pain as being 18 months prior at his September 30, 2016 medical visit, or it was documented incorrectly by Dr. Kovacevic. *Id.* at

5

¶3. Regardless, he affirmed, "I am certain my pain did not start 18 months prior to that visit." *Id.* Petitioner conceded he sought no treatment for his shoulder pain between October 22, 2015 through September 30, 2016; thus, creating a gap in treatment in his medical records. *Id.* at ¶2. During that time, petitioner claimed he "self-medicated with ibuprofen." *Id.*

### 3. Petitioner's Third Affidavit

In a third affidavit, dated May 13, 2019, petitioner affirmed he "received the flu shot at CVS pharmacy…on the way to a construction job site… The flu shot was given extremely high on the shoulder, almost at the top near the bone." Pet. Ex. 8 at ¶1. Petitioner recalled "there was no depth to absorb the long needle" thus "[i]t immediately felt abnormal. It was a sharp pain like no other flu shot I received in the past." *Id.* at ¶2. The pain worsened over the following days, and he went to "an orthopedic doctor" where he "learned that [he] developed inflammation and bursitis from the shot." *Id.* at ¶¶3-4.

Petitioner affirmed continued shoulder pain until around Christmas. His arm was "very painful to sleep on" and it hurt when he played with or lifted his young children. Pet. Ex. 8 at ¶5. However, it did not hurt his shoulder to carry gifts. *Id.*

According to petitioner, his shoulder pain then worsened over the following months, and his "arm was slowly losing mobility." Pet. Ex. 8 at ¶6. He could not care for his children, including "[p]utting them in and taking them out of their car seats, dressing them, and giving baths" due to the pain. *Id.* "This type of pain and loss of movement started in January 2016 and just got worse" until he saw a "shoulder doctor" in September. *Id.* at ¶7. Petitioner affirmed he had "no other trauma to that shoulder during that time period." *Id.* After the September 2016 appointment, he started physical therapy and "went once or twice a week for a couple of months but there was really no progress." *Id.* at ¶¶11-12. At a follow-up appointment, his doctor ordered an MRI, after which his "diagnosis became adhesive capsulitis." *Id.* at ¶13. He restarted physical therapy and "began to see some improvement." *Id.* He continued to do the PT exercises at home, and his "range of motion and pain gradually got better, and finally by January 2018 [his] pain was gone." *Id.* at ¶¶13-14.

According to petitioner he participates in low intensity exercise at home, uses an exercise bike and "very light dumbbells." Pet. Ex. 8 at ¶9. Petitioner added he "do[es] not lift even moderately heavy weights." *Id.* at ¶8.

Petitioner affirmed his "work responsibilities include sitting at a desk and doing online research, typing proposals, pricing construction jobs, and construction site surveillance." Pet. Ex. 8 at ¶10. His shoulder injury affected him "when having to climb ladders to examine certain parts of the projects." *Id.* He "was able to handle climbing by relying on [his] strong arm and just using a light touch with the injured arm." *Id.* Petitioner affirmed that, otherwise, his shoulder pain did not affect his ability to perform his work duties. *Id.*

### 4. Affidavit of Steve Barth dated May 13, 2019.

Mr. Barth is a salesman at Alliance Heating and Air Conditioning. Pet. Ex. 9 at ¶1. He is petitioner's co-worker; they "share the same job title, and therefore perform the same duties and responsibilities." *Id*. Mr. Barth affirmed, "Starting in the fall of 2015, [petitioner] complained of shoulder pain on essentially a daily basis." *Id*. at ¶3. According to Mr. Barth, "it was obvious" that petitioner "was suffering from arm or shoulder discomfort." *Id*. Mr. Barth recalled frequently witnessing petitioner "moving and stretching his arm out and fidgeting to find a comfortable position at his desk." *Id*. Mr. Barth affirmed that petitioner continued to display "physical signs of discomfort" through the spring and summer, which "seemed to get worse with time." *Id*. at ¶4. Mr. Barth recalled that petitioner "[e]ventually…went to the doctor in the fall of 2016, and he began to improve thereafter." *Id*.

### 5. Affidavit of Cheryl Schiavone dated May 13, 2019.

Ms. Schiavone is the human resource manager at Alliance Heating and Air Conditioning, where she has worked since February 2006. Pet. Ex. 10 at ¶1. Ms. Schiavone affirmed that petitioner was hired by Alliance in November 2005. *Id*. at ¶2. He "has always been in good standing" and "has never suffered a work-related injury, presented any disciplinary issue, or otherwise been subject to an issue for which a report must be created." *Id*. Therefore, petitioner does not have a personnel file. *Id*. Ms. Schiavone affirmed that petitioner is a salesperson whose "job duties consist of pricing jobs, job site visits, typing proposals, design work, and ordering equipment/material." *Id*. at ¶3. Petitioner's duties do not include lifting or carrying equipment. *Id*. Ms. Schiavone recalled petitioner "complaining about his shoulder for a long period of time beginning in the fall of 2015-2016" and that "his complaints continued for many months thereafter." *Id*. at ¶4.

### 6. Affidavit of Justin Creasea dated May 21, 2019.

Mr. Creasea is the owner of All Seasons Lawn and Landscape. Pet. Ex. 11 at ¶1. Mr. Creasea affirmed his company was hired "during the month of April 2016 for professional lawn care services." *Id*. at ¶2. Mr. Creasea recalled that petitioner hired him because "he could no longer maintain his lawn due to shoulder pain." *Id*. at ¶3. In Mr. Creasea's opinion, petitioners "lawn was not being professionally maintained." *Id*. at ¶4.

**D.**     **Other Documentary Evidence Submitted**

### 1. Landscaping Invoice

Petitioner submitted an invoice from All Seasons Lawn and Landscape LLC as Pet. Ex. 12. The invoice, dated April 30, 2016, charged petitioner $400.00 for "Lawn Renovation." Pet. Ex. 12 at 1. The service included "[d]ethatching and aeration of the lawn and spring cleanup." *Id*.

### 2. Employee Personnel File

Petitioner submitted a 53-page employee personnel file from Alliance Heating and Air Conditioning as Pet. Ex. 13. The file included financial information, such as tax documents, raises, and 401k contributions, as well as a list of company policies.

The file contained two documents relating to petitioner's alleged shoulder injury. The first was a statement authored by Cheryl Schiavone and dated April 16, 2019. *See* Pet. Ex. 13 at 32. Contrary to Ms. Schiavone's affidavit signed a month later, the statement in the file reads: "complain[ed] about his shoulder for a long period of time beginning around January of 2016." *Id*. The second document in the file that related to petitioner's shoulder is a handwritten note from a voicemail left by petitioner's counsel for Ms. Schiavone on April 18, 2019, which reads: "Jan 2016 starting [sic] complaining about shoulder being painful & restricting usage. Went to Dr. Went to Physical Therapy." *Id*. at 33.

### III. Applicable Legal Standards

#### A.   Legal Standard Regarding Fact-Finding

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020); *Cucuras v. Sec'y of Health & Human Servs.,* 26 Cl. Ct. 537, 543 (1992), *aff'd,* 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id*. A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous

8

documents, courts generally give the contemporaneous documentation more weight." *Id.* Similarly, contemporaneous medical records may be considered more persuasive than a petitioner's affidavit created years after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes).

### B.   Six-Month Requirement

The Vaccine Act requires petitioners to show by preponderant evidence that the "residual effects or complications of [the alleged] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine…." 42 U.S.C. § 300aa-11(c)(1)(D)(i). In *Cloer v. Sec'y of Health and Human Servs.*, the Federal Circuit explained that the six-month requirement is "a condition precedent for filing a petition for compensation" in the vaccine program and serves as a restriction on eligibility for compensation in the Program. 654 F.3d 1322, 1335 (Fed. Cir. 2011). Congress intended this duration requirement "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." *Id.* (quoting H.R. Rep. No.100-391(I), at 699 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, -373.

### C.   Legal Standard Regarding Causation

The Vaccine Act provides petitioners with two avenues to receive compensation for their injuries resulting from vaccines or their administration. First, a petitioner may demonstrate that he suffered a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the provided time period. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Alternatively, where the alleged injury is not listed on the Vaccine Injury Table, a petitioner may bring an "off-Table" claim. § 11(c)(1)(C)(ii). An "off-Table" claim requires that the petitioner "prove by a preponderance of the evidence that he vaccine at issue caused the injury." *Capizzano*, 440 F.3d at 1320; *see* § 11(c)(1)(C)(ii)(II). Initially, a petitioner must provide evidence that he suffered, or continues to suffer, from a definitive injury. *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010). A petitioner need not show that the vaccination was the sole cause, or even the predominant cause, of the alleged injury; showing that the vaccination was a "substantial factor" and a "but for" cause of the injury is sufficient for recovery. *See Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006); *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999).

### IV. Discussion

### A.   Parties' Arguments

Petitioner argues that his left shoulder injury meets all of the criteria of an on-Table SIRVA claim, with symptoms persisting for longer than six months. Motion, ECF No. 38 at 10-13. He submits his medical records show no left or right shoulder pain prior to vaccination on October 12, 2015. Petitioner acknowledges that he "did not seek treatment for eleven months following his initial visit for shoulder pain" but asserts that "delayed treatment is not necessarily proof of

resolution of symptoms." *Id.* at 10. Petitioner argues his medical records beginning on September 30, 2016, substantiate his claim of injury in excess of six-months. *Id* at 11. However, petitioner then argues the September 30, 2016 record documenting onset as 18 months prior to the visit is "unreliable and should be disregarded." *Id.* at 11. Citing *Cucuras,* he argues that greater weight should be afforded to the medical record closest in proximity to the vaccination, his October 22, 2015 visit with Dr. Lucke ten days after vaccination. *Id.* at 12. He submits the record from that visit satisfies onset within 48 hours because "[t]he note from the visit states, '38-year-old-male received a flu shot in his left deltoid tenderness (presumably "tenderness" was meant to be "ten days") ago. Since then he has had severe pain in the shoulder.'" *Id.* Petitioner further argues his pain was limited to his left shoulder;[4] he "did not mention any right shoulder symptoms, whatsoever" at his initial visit ten days after vaccination. *Id.* at 13. He submits that respondent has not identified any alternative cause in his records. *Id.*

Respondent argues petitioner does not qualify for an on-Table SIRVA and has not submitted preponderant evidence for entitlement. Response, ECF No. 39 at 1. Respondent submits that while the October 22, 2015 record documents shoulder pain, it "does not note that petitioner's pain began within 48 hours…it notes a relative time of onset, which is non-specific." *Id.* at 9. Respondent points to the next medical record documenting shoulder pain on September 30, 2016, which contradicts petitioner's allegation of onset within 48 hours, because, "[h]e reported onset of his symptoms 18 months prior (February 2015), and made no mention of the flu vaccine." *Id.* Further, respondent notes that petitioner's initial complaints were not limited to his left shoulder but included radiating numbness down his left arm, and when petitioner finally attended physical therapy, he reported bilateral shoulder pain. *Id.* at 13. Respondent argues petitioner failed to meet the six-month requirement "because there is an unsubstantiated 11-month gap in treatment." *Id.* at 10.

**B.     Analysis of an on-Table SIRVA**

   **a. Criteria for an on-Table SIRVA Claim**

SIRVA is an established injury following vaccination and as such, is an injury listed on the Vaccine Table. In accordance with section 312(b) of the National Childhood Vaccine Injury Act of 1986, Title III of Public Law 99-660, 100 Stat. 3779 (42 U.S.C. § 300aa-1 note) and section 2114(c) of the Public Health Service Act as amended (PHS Act) (42 U.S.C. § 300aa-14(c)), the following change, *inter alia,* to the Vaccine Table became effective on March 21, 2017: "XIV. Seasonal influenza vaccines…(B) Shoulder Injury Related to Vaccine Administration ≤48 hours." National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 82 Fed. Reg. 6,294 (Jan. 19, 2017) (to be codified at 42 C.F.R. pt. 100).

The Qualifications and Aids to Interpretation ("QAI") define and describe the scope of SIRVA claims that qualify as Table injuries.

---

[4] Petitioner's characterization of his October 22, 2015 record is incorrect. While he did not mention right shoulder pain at this visit, his pain was not limited to his left shoulder as he reported radiating numbness down his left arm. Pet. Ex. 2 at 1.

A vaccine recipient shall be considered to have SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10)(i)-(iv).

### b. Evaluation of Petitioner's Claim for an on-Table SIRVA

Two of the four criteria for on-Table SIRVA claims are at issue in this matter, specifically QAI (ii), whether petitioner's pain occurred within the specified time-frame of 48 hours of vaccination, and QAI (iii), whether petitioner's pain and reduced range of motion were limited to the shoulder in which he received the vaccination. As discussed below, petitioner does not satisfy these criteria.

#### (1) Petitioner's onset of shoulder pain did not occur within 48 hours.

The medical records do not document onset of petitioner's alleged shoulder injury within 48 hours of his October 12, 2015 vaccination, and the affidavits filed in support of his claim do not overcome the presumption of weight afforded to contemporaneous medical records.

Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras*, 993 F.2d at 1528. Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Id*. They may also be considered more persuasive than documents prepared years later for litigation, such as a petitioner's affidavit. *Gerami*, 2013 WL 5998109, at *4. While statements made after-the-fact can be deemed persuasive, especially when they do not contradict records, they are inherently less persuasive than contemporaneous medical records. *Sanchez*, 2013 WL 1880825, at *2.

Here, the medical record does not document onset of petitioner's alleged shoulder injury as occurring within 48 hours of his vaccination on October 12, 2015. On October 22, 2015, ten days after vaccination, petitioner presented to OrthoFast complaining of severe pain in his left shoulder with radiating numbness down his left arm and difficulty lifting his shoulder. Pet. Ex. 2

11

at 1. He reported experiencing severe shoulder pain since having received a flu vaccine, but he did not report immediate pain upon receipt of the vaccination or report anything unusual about the administration of the vaccine. *See id.* Following a physical examination, the doctor diagnosed petitioner with nondescript left deltoid pain. The doctor noted that the petitioner's main complaints were numbness and he did not relate petitioner's diagnosis or symptoms to petitioner's vaccination. *See id.* Two months later, on December 21, 2015, petitioner presented to his primary care provider for a URI. He did not report any left shoulder pain and further reported no joint pain and normal extremities. Pet. Ex. 5 at 5-7. Eleven months later, on September 30, 2016, petitioner reported "*insidious* onset [of] shoulder pain about 18 months ago (February 2015)." Pet. Ex. 3 at 1 (emphasis added). Petitioner was referred for PT where he presented on October 11, 2016 and reported "bilateral shoulder pain intermittently yet progressing towards constant pain, especially over the last 2 months (L>R)." *Id.* at 4-5. He did not associate his shoulder pain at either of these two visits with his vaccination and the physical therapist recorded an "Onset of Illness/Injury Date: 8/12/2016." *Id.* at 4. Petitioner did not associate his shoulder pain with receipt of the October 12, 2015 flu vaccine or report that onset occurred within 48 hours of vaccination at any medical appointments. *See id.* at 4-55.

The affidavits filed by petitioner to support his claim provide little on the matter of onset and are not persuasive of petitioner's claim of onset within 48 hours. Petitioner submitted six affidavits in support of his claim, three of which were his own. In his first affidavit, dated October 16, 2017, petitioner affirmed receipt of an influenza vaccine on October 12, 2015 at CVS Pharmacy and that he "sustained adhesive capsulitis, shoulder impingement, and biceps tendonitis." Pet. Ex. 4 at 1 ¶2, ¶3. There were no details related to his receipt of the vaccination or the onset of his pain. In his second affidavit, dated February 13, 2018, over two years after his receipt of the vaccination, petitioner affirmed he "began feeling shoulder pain immediately after the vaccination." Pet. Ex. 7 at 1 ¶1. His shoulder hurt as soon as the needle was pulled out, and "[i]t did not feel like normal soreness." *Id.* Petitioner further affirmed that at his September 30, 2016 visit with Dr. Kovacevic, he either misreported the timeframe of the onset for his shoulder pain as being 18 months prior or it was documented incorrectly by Dr. Kovacevic. "I am certain my pain did not start 18 months prior to that visit." *Id.* at ¶3. In his third affidavit, dated May 13, 2019, three and half years after his receipt of the vaccination, petitioner affirmed that "[t]he flu shot was given extremely high on the shoulder, almost at the top near the bone," and "…there was no depth to absorb the long needle. It immediately felt abnormal. It was a sharp pain like no other flu shot I received in the past." Pet. Ex. 8 at ¶1, ¶2. The pain worsened over the following days, and he went to an orthopedic doctor where he "learned that [he] developed inflammation and bursitis from the shot."[5] *Id.* at ¶¶3-4.

Of the three affidavits submitted by petitioner, only the latter two address onset of symptoms within 48 hours of his vaccination, both of which were only filed after issues were raised by the special master. Despite being prepared years after vaccination, each affidavit became more elaborate in describing onset, providing details not found in any other records. The second affidavit described pain immediately after the needle was removed, and the third affidavit described pain upon administration of the shot, detailing that the shot was given too high. Further, petitioner's descriptions of immediate shoulder pain following vaccination are inconsistent with his medical

---

[5] Petitioner is presumably referring to his October 22, 2015 appointment with Dr. Lucke. The October 22, 2015 records from Dr. Lucke do not mention bursitis or inflammation.

12

record indicating "insidious onset" 18 months prior to September 2016 or onset of progressively worsening pain in August of 2016. *See* Pet. Ex. 3 at 1, 4. Petitioner's affidavits attempting to place onset within 48 hours of vaccination, created years after the fact, are less persuasive than the contemporaneous medical records, especially as his affidavits are inconsistent with each other and uncorroborated. *See Gerami*, 2013 WL 5998109, at *4.

The additional affidavits petitioner submitted, from coworkers and a landscaper, provide little more than generalizations as to onset of petitioner's shoulder pain. Petitioner filed the affidavits of two co-workers, Steve Barth and Cheryl Shiavone, both dated May 13, 2019 and an affidavit from his landscaper, Justin Creasea, dated May 21, 2019. Mr. Barth affirmed petitioner began complaining of shoulder pain "starting in the fall of 2015." Pet. Ex. 9 at ¶3. Ms. Schiavone affirmed petitioner complained "about his shoulder for a long period of time beginning in the fall of 2015-2016." Pet. Ex. 10 at ¶4. The landscaper, Mr. Creasea, provided no onset information at all. Pet. Ex. 11 at ¶4. None of these affidavits speak to whether petitioner's shoulder pain began 48 hours after his October 12, 2015 vaccination nor do they even mention petitioner's flu vaccine when providing a timeframe for the onset of petitioner's shoulder pain.

Furthermore, conflicting statements detract from the reliability of the additional affidavits submitted. Petitioner filed his personnel file, one that initially did not exist, containing two additional documents related to petitioner's alleged shoulder injury. The first, a statement authored by Ms. Schiavone dated April 16, 2019, reads, "complain[ed] about his shoulder for a long period of time beginning around January of 2016." *See* Pet. Ex. 13 at 32. The second, a handwritten note from a voicemail left by petitioner's counsel for Ms. Schiavone on April 18, 2019, reads, "Jan 2016 starting (sic) complaining about shoulder being painful & restricting usage. Went to Dr. Went to Physical Therapy." *Id*. at 33. Despite these statements, Ms. Schiavone's affidavit dated May 13, 2019, just one month later, affirmed petitioner's shoulder complaints began in the "fall 2015-2016." These statements and Ms. Schiavone's affidavit are inconsistent, difficult to reconcile, and do not support onset within 48 hours of petitioner's flu vaccination on October 12, 2015.

Overall, only petitioner's medical record from October 22, 2015 provides any support for his claim of onset of left arm or shoulder pain following his flu vaccine, but even this record is vague and deficient to support onset within 48 hours. While petitioner's report to Dr. Lucke of left shoulder pain "since" a vaccine ten days ago could be interpreted as pain beginning within a 48-hour period of the flu vaccine, there is no independent corroborating evidence for that onset period. Petitioner did not report to Dr. Lucke immediate onset of shoulder pain with receipt of the vaccination or any of the details contained in his later affidavits, nor did Dr. Lucke relate petitioner's shoulder pain to the vaccination. There are no reports in any of his medical records of the unusual soreness, immediate sharp pain, high injection site, or any of the onset details found in petitioner's affidavits created years later. None of the medical records, including the record for October 22, 2015, corroborate petitioner's claim of immediate onset. As contemporaneous records made for treatment are presumed to be complete, it strains reason to believe that the details involved in the receipt of his vaccination as described in petitioner's affidavits would not have been reported to his medical provider on October 22, 2015—nor does petitioner claim that the record is incomplete or that he provided those details to any medical provider. None of the additional affidavits from petitioner's acquaintances corroborate petitioner's claim regarding onset and none of the evidence in the record preponderantly establishes onset within 48 hours.

13

Based on the foregoing, petitioner has not satisfied the second QAI criterion for onset within 48 hours.

### (2) Petitioner's shoulder pain was not limited to his left shoulder.

The medical records provide, from the first documented report of shoulder pain, that petitioner's shoulder pain was not limited to his left shoulder. At his October 22, 2015 visit, ten days after vaccination, petitioner reported left shoulder pain with radiating numbness down his left arm. Pet. Ex. 2 at 1. Dr. Lucke noted tenderness to palpation over the lateral deltoid, active range of motion to 90 degrees, but passive range of motion as full. Dr. Lucke concluded left deltoid pain, prescribed a steroid and instructed petitioner to follow up if his pain persisted. *Id.* There was no follow-up care for the complaints made to Dr. Lucke. On September 30, 2016, eleven months later, petitioner presented to Dr. Kovacevic and reported sharp stabbing shoulder pain with insidious onset about 18 months ago. He was diagnosed with left shoulder impingement, bicep tendinitis and SLAP sprain. Pet. Ex. 3 at 1. On October 11, 2016, petitioner reported for his initial PT evaluation and reported "bilateral shoulder pain intermittently yet progressing towards constant pain, especially over the last 2 months (L>R)." *Id.* at 5. On November 11, 2016, petitioner continued to complain of bilateral shoulder pain though the right shoulder was improving. *Id.* at 9-10.

Petitioner argues that he has satisfied the third QAI criterion because "he did not mention any right shoulder symptoms, whatsoever" at his *initial* visit for shoulder pain. Motion at 13. Petitioner is presumably referring to his October 22, 2015 medical visit. However, at that visit, petitioner not only complained of left shoulder pain but also of numbness radiating down his left arm. Pet. Ex. 2 at 1. Dr. Lucke specifically noted that petitioner's major complaint was numbness and tingling radiating down petitioner's left arm. *Id.* Moreover, petitioner's argument suggests that his medical records from September 30, 2016, stabbing left shoulder pain of insidious onset 18 months prior, and from October 11, 2016, bilateral shoulder pain for two months L>R, should be disregarded. Pet. Ex. 3 at 1, 4-5. Petitioner cannot cherry-pick what he wishes to rely on in support of one issue while suggesting the records be disregarded when they fail to support another.[6] The medical records clearly indicate that petitioner's shoulder pain was not limited to his left shoulder when he presented to Dr. Lucke at which time he complained of pain radiating down his left arm. Eleven months later, he reported insidious onset of left shoulder pain followed by bilateral shoulder pain beginning in August of 2012. Accordingly, petitioner has not satisfied the third QAI criterion.

Having failed to satisfy all the QAI criteria; petitioner's alleged injury does not qualify as an on-Table SIRVA.

### C.   Analysis of an off-Table SIRVA

#### a.   Criteria for an off-Table Claim: *Althen* Analysis

---

[6] In his Motion for Ruling on the Record, petitioner argues that the September 30, 2016 and October 11, 2016 records should be considered supportive of continued shoulder pain from his vaccination, but disregarded on the issue of onset and whether pain was limited to his left shoulder. *See* Motion at 11.

Because petitioner does not meet the criteria for an on-Table SIRVA claim, his claim is classified as "off-Table." To prevail on an "off-Table" claim, petitioner must show by preponderant evidence that he suffered an injury and that this injury was caused by the vaccination at issue. *Capizzano*, 440 F.3d at 1320.

Petitioner must prove causation under the three-pronged test established in *Althen*, 418 F. 3d at 1278. *Althen* requires that petitioner establish by preponderant evidence that the vaccination he received caused his injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* Together, these prongs must show "that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" *Stone v. Sec'y of Health & Human Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) (quoting *Shyface*, 165 F.3d at 1352-53).

The first *Althen* prong requires petitioner to provide a "reputable medical theory" demonstrating that the vaccines received *can* cause the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citation omitted). To satisfy this prong, petitioner's "theory of causation must be supported by a 'reputable medical or scientific explanation.'" *Andreu ex rel. Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009) (quoting *Althen*, 418 F.3d at 1278). This theory need only be "legally probable, not medically or scientifically certain." *Id.* at 1380 (emphasis omitted) (quoting *Knudsen v. Secretary of Health & Human Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994)). Nevertheless, "petitioners [must] proffer trustworthy testimony from experts who can find support for their theories in medical literature." *LaLonde v. Secretary of Health & Human Servs.*, 746 F.3d 1334, 1341 (Fed. Cir. 2014).

The second *Althen* prong requires proof of "[a] logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1278). In other words, even if the vaccination can cause the injury alleged, petitioner must show "that it did so in [this] particular case." *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 962 n.4 (Fed. Cir. 1993) (citation omitted). "A reputable medical or scientific explanation must support this logical sequence of cause and effect," *id.* at 961 (citation omitted), and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury," *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu*, 569 F.3d at 1375).

To satisfy the third *Althen* prong, petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination

and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

While it is accepted in the Vaccine Program that vaccinations *can* cause SIRVA, this requires that petitioner satisfy the four QAI criteria as specified, which petitioner has not. Therefore, in order to demonstrate entitlement to causation under *Althen*, petitioner must provide an expert opinion explaining how petitioner's flu vaccination actually caused his shoulder injury. Petitioner did not provide any medical opinion or medical records to support his claim, and none of his treating physicians equated his left shoulder pain to his flu vaccination. As such, he has not satisfied the *Althen* prongs. 42 U.S.C. § 300aa–13(a) (indicating a special master cannot award compensation based upon petitioner's claims alone).

### D.   There is not preponderant evidence that petitioner suffered from an alleged SIRVA injury for six months.

Even if petitioner had satisfied his burden for a Table SIRVA claim or the *Althen* prongs for an off-Table claim, petitioner has failed to satisfy the severity requirement for sequela in excess of six-months.

Petitioner acknowledged receiving no treatment between October 22, 2015 and September 30, 2016. Pet. Ex. 7 at ¶2. Thus, there is no corroborating medical evidence following his October 22, 2015 medical visit to support his claim of ongoing shoulder pain associated with his flu vaccine in excess of six months. However, petitioner argues that "delayed treatment is not necessarily proof of resolution of symptoms." Motion at 10. He affirmed continued shoulder pain through Christmas of 2015, that his shoulder was "very painful to sleep on" and hurt when he played with or lifted his young children. Pet. Ex. 8 at ¶5. He further affirmed his shoulder pain became worse in the following months, and his "arm was slowly losing mobility." Pet. Ex. 8 at ¶6. He could not care for his children, including "[p]utting them in and taking them out of their car seats, dressing them, and giving baths," due to the pain. *Id.* "This type of pain and loss of movement started in January 2016 and just got worse" until he saw a "shoulder doctor" in September of 2016. *Id.* at ¶7. Relying on medical records more than eleven months after vaccination, petitioner argues that his "medical records do substantiate left shoulder symptoms for more than six months post-vaccination." Motion at 11.

Contrary to petitioner's argument, no medical records exist to support his claim that he experienced ongoing pain related to his flu vaccine. Pet. Ex. 2 at 1. Assuming petitioner's arm pain was associated with his flu vaccine when he visited Dr. Lucke on October 22, 2015, petitioner did not return or report any of the above limitations to Dr. Lucke despite being advised to follow up if pain persisted. *Id.* Further, petitioner presented to his primary care provider on December 21, 2015 for a URI but made no mention of any left shoulder pain or any of the details contained in his affidavits. In fact, he reported no joint pain or abnormal extremities. Pet. Ex. 5 at 6-7. Medical records created contemporaneously with events they describe are presumed to be accurate and complete, and it therefore strains reason that petitioner would have affirmatively indicated normal extremities, no joint pain, and failed to report any left shoulder pain if he was indeed experiencing pain causing difficulty sleeping and interfering his ability to care for his young children. *See*

16

*Cucuras*, 993 F.2d 1525, 1528. Petitioner's December 21, 2015 medical record does not corroborate his affirmations of continued shoulder pain after October of 2015. *See* Pet. Ex. 8 at ¶5.

Additionally, petitioner's following medical visits relating to shoulder pain, over eleven months later, make no mention of the vaccine or daily activity limitations as detailed in his affidavits. On September 30, 2016, petitioner presented to Dr. Kovacevic with 18 months of left shoulder pain with insidious onset. Pet. Ex. 3 at 1-3. Even if the 18-month history was documented incorrectly at this appointment as petitioner alleges, petitioner did not report in any way that his shoulder pain was related to a flu vaccination or vaccine administration site. *See* Pet. Ex. 7 at ¶3; Pet. Ex. 3. On October 11, 2016, petitioner presented to PT and reported progressively worsening bilateral shoulder pain L>R, particularly in the last two months. The physical therapist documented a two-month onset. *See* Pet. Ex. 3 at 4-5. As with his visit with Dr. Kovacevic, petitioner did not report to the physical therapist that his left shoulder pain was related to a vaccine or provide different causes for pain in each shoulder. *See id.* There was no mention by petitioner to either provider that his pain began with a flu vaccine or that his pain had been interfering with his family responsibilities or daily activities.

Petitioner further postures that "unbiased and disinterested fact witnesses testified to petitioner's ongoing shoulder complaints through the spring and summer of 2016" and are supportive of his claims. Motion at 11. However, the affidavits submitted are at best generalizations with no definitive timeframes and no foundation for how or why these individuals recall any of the information they affirm. Mr. Barth's affidavit is vague and inconclusive, affirming that he observed "physical signs of discomfort" from petitioner through the spring and summer of 2016. Pet. Ex. 9 at ¶4. Ms. Schiavone's affidavit is similarly vague, affirming that petitioner began complaining of shoulder pain in the "fall 2015-2016" which "continued for many months thereafter." Pet. Ex. 10 at ¶4. Furthermore, as previously noted, Ms. Schiavone's affidavit is inconsistent with her written statement contained in petitioner's employment file, which states that petitioner began complaining of shoulder pain around January of 2016 and does not detail how long his pain lasted. Pet. Ex. 13 at 32. Mr. Creasea, the landscaper petitioner hired in April of 2016, affirmed that petitioner could not do his lawn due to shoulder pain but provided no information as to when petitioner's pain began and how long it had been going on for. It is unclear that any shoulder pain observed by petitioner's coworkers or landscaper were related to petitioner's flu vaccination. These after-the-fact statements are less probative than contemporaneous medical records and none of them are persuasive in satisfying petitioner's severity requirement.

The accuracy of the 18-month or two-month onset is irrelevant when considering petitioner's failure to report to any provider after October 22, 2015 that his shoulder pain was in any way associated with receipt of a flu vaccine on October 12, 2015. If petitioner's affidavits are believed and his recital of pain associated with the receipt of his vaccine accepted, one must question why he would wait so long to pursue treatment, how he would fail to report such information when seeking care eleven months later and why he would report an insidious onset with no trauma. It is further perplexing why petitioner would report bilateral shoulder pain without providing causal distinction if only his left shoulder pain had persisted since his vaccination. There is no preponderant evidence to support that petitioner suffered a shoulder injury for more than six months as a result of his October 12, 2015 flu vaccination.

## IV. Conclusion

Petitioner has failed to provide preponderant evidence that his October 12, 2015 vaccination resulted in a SIRVA and/or that the alleged SIRVA lasted more than six months. When petitioners fail to carry their burden, the Secretary is not required to present an alternate explanation for the vaccinee's condition. *De Bazan*, 539 F.3d at 1352. The petitioner in this matter has failed to put forth a prima facie showing of causation; therefore, respondent is not required to demonstrate that a "factor unrelated" was the sole cause of petitioner's condition.

For these reasons, I find that petitioner has not established entitlement to compensation and his petition must be **dismissed**. In the absence of a timely filed motion for review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this decision.[7]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

[7] Pursuant to Vaccine Rule 11 (a), if a motion for review is not filed within 30 days after the filing of the special master's decision, the clerk will enter judgment immediately.